**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-179-APM** |
| **JAMES BREHENY,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE, AND MOTION FOR LEAVE TO FILE REDACTED SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence James Breheny to three years of probation, with the special conditions that the defendant serve the first six months of probation on home confinement, perform 120 hours of community service, and pay $2,000 in restitution and the mandatory $100 special assessment. Such a sentence would be sufficient to reflect the seriousness of this offense while also accounting for the defendant's early acceptance of responsibility and the substantial assistance he has provided to law enforcement pursuant to his cooperation plea agreement. To the extent that this memorandum discusses certain aspects of the defendant's cooperation in detail, the government seeks leave to file a redacted version of this memorandum on the public docket and will separately move to file the unredacted memorandum under seal.

## I.     INTRODUCTION

On the afternoon of January 6, when it became clear that Congress was going forward with the certification of the 2020 presidential election, Defendant Breheny joined the mob of rioters on

the east plaza of the United States Capitol that pushed past police officers up the central, exterior steps, through the East Rotunda Doors, and into the building. The defendant's participation in the attack on the Capitol was not random; it was the culmination of weeks, if not months of following the increasingly violent calls by Elmer Stewart Rhodes III, a leader of a group called the Oath Keepers, to oppose the lawful transfer of power from Donald Trump to Joseph Biden. Breheny was privy to these communications because he was a regional leader of the Oath Keepers, and he was in touch with Rhodes directly, prior to January 6.

At the same time, Breheny did not actively participate in the Oath Keepers' planning and coordination for the attack on the Capitol (he was added to the group's encrypted chat for the January 6 operation on the morning of the attack), and he did not enter the Capitol with them on January 6. For this reason, Breheny was not charged with participating in a conspiracy with the other Oath Keepers. Furthermore, Breheny was inside the Capitol for only five to six minutes and did not directly harm or seek to harm any officers or property during this offense. Breheny also has been cooperative with law enforcement since he was first approached by them just a week after the attack. At that first encounter, Breheny willingly spoke to law enforcement and admitted to entering the Capitol on January 6. Over the three years that have followed, the defendant has proffered multiple additional times with law enforcement and has provided fulsome, credible, and relevant information as described below. On June 6, 2023, the defendant fully accepted responsibility and pled guilty, pursuant to a cooperation plea agreement, to one count of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2.

Six months of home confinement, coupled with a requirement of restitution and community

service during a lengthy period of probation, is a sufficient sentence to reflect the seriousness of this offense while also recognizing Breheny's substantial assistance to law enforcement.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 58, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the 2020 presidential election.

### B.    The Defendant's Role in the January 6, 2021 Attack on the Capitol

Defendant Breheny was a member of the mob that amassed outside the East Rotunda Doors shortly before the 2:38 p.m. breach. Publicly available video footage of that mob captured rioters violently assaulting police officers with flag poles, projectiles, and chemical irritants. The video also shows rioters disarming at least one law enforcement officer by stealing his shield as the mob shouted, "Get their shields! Get their shields!" Breheny can be seen in this video in close proximity to the ongoing violence, although he did not himself throw and objects or assault any officers. In the video available at https://www.youtube.com/watch?reload=9&app=desktop&v=MVullQb-Lec, which will be submitted to the Court and counsel as Government's Sentencing Memorandum Exhibit 1, Breheny can be seen at the 3:24 minute mark, as depicted in the screen shot below:



Breheny took the following photograph of himself with the mob outside the East Rotunda doors around the same time:



This photograph was attached to a message Breheny sent to an acquaintance that was recovered from his phone. Additional photographs recovered from Breheny's phone, combined with Capitol CCTV footage and public source videos, show that Breheny entered and walked around the Rotunda area of the Capitol before exiting the building about five to six minutes after he entered.

After the riot, Breheny sent multiple messages to contacts where he bragged about gaining entry to the Capitol. These messages included:

- "I breached the Capital door!"

4

- "We breached the door Baby."

- "Made it in Brother."

- "Made it in."

- "Yup. Made it in [laughing emoji]."

- "I got in."

- "Made it in!" "Capital."

ECF 58 at ¶22.

### *Coordination with Rhodes and the Oath Keepers*

As noted above, Breheny traveled to and was present at the Capitol on January 6 as part of an Oath Keepers operation. Breheny was the Bergen County Coordinator for the Oath Keepers in New Jersey. ECF 58 at ¶3. Through his affiliation with the Oath Keepers, Breheny was aware of its leader's increasingly violent rhetoric about the need to forcibly oppose the results of the election. For example, on December 14, 2020, in response to the November 2020 Presidential election, Rhodes published on the Oath Keepers' website a letter titled, "Open letter to President Trump: You Must Use Insurrection Act to 'Stop the Steal' and Defeat the Coup." ECF 58 at ¶4. Citing "well-orchestrated mass vote fraud" resulting in the "install[ation]" by "Communist Chinese and their domestic enemy allies" of "illegitimate puppet, Joe Biden," Rhodes implored President Trump to:

> [A]ct NOW as a wartime President, pursuant to your oath to defend the Constitution, which is very similar to the oath all of us veterans swore. We are already in a fight. It's better to wage it with you as Commander-in-Chief than to have you comply with a fraudulent election, leave office, and leave the White House in the hands of illegitimate usurpers and Chinese puppets. Please don't do it. Do NOT concede, and do NOT wait until January 20, 2021. Strike now.

5

*Id.* Rhodes further warned: "If you fail to act while you are still in office, we the people will have to fight a bloody civil war and revolution against these two illegitimate Communist Chinese puppets, and their illegitimate regime." ECF 58 at ¶5. Rhodes ultimately requested in this letter that President Trump "[i]ssue a Presidential Proclamation, directly invoking the Insurrection Act, declaring an insurrection, rebellion, and coup to be in effect by domestic enemies of the U.S. Constitution and traitors who are in collusion with and/or acting as agents of a foreign enemy (specifically Communist China, but also other known or unknown foreign enemies) and to call up the militia (including the National Guard, us veterans, and patriotic Americans of military age) and US military to suppress the insurrection." *Id.*

On December 21, 2020, Breheny invited Rhodes to a leadership meeting of "multiple patriot groups" from the Mid-Atlantic states that was to take place in Quarryville, Pennsylvania on January 3, 2021. ECF 58 at ¶6. Breheny forwarded Rhodes a message describing the purpose of the meeting, which was to prepare for a January 6 rally in Washington, DC. *Id.* The message stated, "This will be the day we get our comms on point with multiple other patriot groups, share rally points etc. This one is important and I believe this is our last chance to organize before the show. This meeting will be for leaders only." *Id.* In inviting Rhodes to this meeting, Breheny cautioned, "No cell phones. Need to be Faraday bag prior to site." *Id.*

On the morning of January 6, Rhodes added Breheny to an encrypted group chat titled "DC OP: Jan 6 21" on Signal, a secure messaging application. ECF 58 at ¶7. The chat included several Oath Keepers leaders from various states. *Id.* On that chat, at approximately 6:27 a.m., Rhodes stated, "We will have several well equipped QRFs outside DC. And there are many, many others,

from other groups, who will be watching and waiting on the outside in case of worst case scenarios." ECF 58 at ¶8.

At approximately 10:00 a.m., Breheny traveled to the Ellipse area, where he listened to several speeches at a rally. ECF 58 at ¶9. Shortly after 1:00 p.m., as the Certification proceeding began in both the House and Senate chambers, a large crowd gathered outside the Capitol and, ultimately, members of the crowd breached the building. ECF 58 at ¶12. Around this time, Rhodes posted to the encrypted group chat that included Breheny: "Pence is doing nothing. As I predicted." ECF 58 at ¶13. Rhodes added, "All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough." *Id.*

Following Rhodes' call to action, a little over a dozen Oath Keeper members and affiliates—many of whom were wearing camouflage clothing, helmets, and patches with the Oath Keepers name, logo, and insignia—marched up the steps and through the crowd outside and through the East Rotunda doors in a military-style "stack" formation ("Stack One"). ECF 58 at ¶18. Less than a minute after Stack One breached the doors, the defendant breached the building through the same doors. *Id.* In pleading guilty, Breheny admitted that he took these actions in part to join the efforts to obstruct Congress from certifying the electoral college vote. *Id.* After exiting the Capitol later that afternoon, Breheny gathered with other Oath Keepers approximately 100 feet from the northeast corner of the Capitol. ECF 58 at ¶19. That evening, Rhodes called the rioters who breached the building "patriots." ECF 58 at ¶20.

### Post-January 6 Destruction of Evidence

After January 6, in a text message conversation with an associate, in response to Breheny's pictures of the Capitol, the associate advised, "Don't post it on FB," to which Breheny responded,

"Nope." ECF 58 at ¶23. "FB" is common shorthand for "Facebook." *Id.* Breheny also texted, "I have to clear chats." *Id.* In another text message conversation, an associate advised Breheny of the following: "They're going through social media looking at pictures to try to identify and prosecute anyone in the Capitol building." ECF 58 at ¶24. On January 8, 2021, an associate sent a message via Signal and advised Breheny to "Delete all pictures, messages and get a new phone. Praying for you brother." ECF 58 at ¶25. Breheny subsequently deleted photos of his presence in the Capitol on his phone and deleted his Facebook account, which contained information detailing his presence in the riot. ECF 58 at ¶26.

### III.   THE CHARGES AND PLEA AGREEMENT

On June 6, 2023, Breheny waived his right to be indicted and pled guilty to an Information charging him with one count of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2.

### IV.   STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, Breheny faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 for this offense.

### V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.      The Calculation of the Parties and the Presentence Report

As calculated by the Presentence Report, ECF 63, ¶¶98-108, and agreed upon by the parties

in the plea agreement, ECF 57, the following Sentencing Guidelines sections apply:

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2 | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference With Justice | +3 |
| U.S.S.G. § 3C1.1 | Obstruction (destroying documents) | +2 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -2 |
| U.S.S.G. § 3E1.1(b) | Timely Acceptance of Responsibility | -1 |
| | Total | 16 |

The parties' estimated guidelines calculation is supported factually and legally. First, for

violations of 18 U.S.C. § 1512(c)(2), Obstruction of an Official Proceeding, the applicable Chapter

Two Guideline for this offense is U.S.S.G. § 2J1.2, "Obstruction of Justice." U.S.S.G. Appendix

A.

Next, the three-level increase under Section 2J1.2(b)(2) applies "if the offense resulted in

substantial interference with the administration of justice," and Breheny's conduct in participating

on the attack on the Capitol clearly meets this criteria. The phrase "administration of justice," as

used in these two specific offense characteristics, is synonymous with "official proceeding" as

defined in 18 U.S.C. § 1515(a)(1), including a "proceeding before the Congress" such as the

certification of the Electoral College vote. *United States v. Matthew Wood*, 21-cr-223 (Nov. 28,

2022), Sent. Tr. at 35-38. The Guidelines define the term "[s]ubstantial interference with the

administration of justice" to include "a premature or improper termination of a felony

investigation; an indictment, verdict, or any judicial determination based on perjury, false

testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or

court resources*." U.S.S.G. § 2J1.2, cmt. n.1 (emphasis added).

9

It is hard to imagine a more significant interference with the administration of justice that the January 6 attack on the Capitol. The evidence admitted by Breheny through his guilty plea, coupled with the evidence presented at the trials of other Oath Keeper members and affiliates convicted before this Court,[1] has established that the conduct of Breheny and his fellow rioters resulted in the evacuation of an entire branch of the federal government and the suspension of a congressional proceeding that was required by the Constitution and federal statute to take place at a certain date, time, and location so that our country could peacefully transfer presidential power from one person to the next. As this Court observed in sentencing Rhodes and some of his co-conspirators, "[T]he fact that the proceedings had to be adjourned and then were adjourned for a period of time constitutes substantial interference." *Rhodes, et al.,* Case No. 22-cr-15, 5/25/23AM Tr. at 75.

The events of January 6 also indisputably resulted in the "unnecessary expenditure of substantial governmental . . . resources," with the latest estimate of damages from entities responsible for the United States Capitol[2] totaling approximately $2.9 million. Breheny and his fellow rioters' actions contributed to that "unnecessary expenditure" of substantial governmental resources: the deployment of hundreds of law enforcement officers to defend and then clear the

---

[1] *See United States v. Rhodes, et al.,* Case No. 22-cr-15, and *United States v. Parker*, et al., Case No. 21-cr-28.

[2] Including the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, the Office of the Secretary of the United States Senate, the Senate Sergeant at Arms, and the United States Capitol Police.   Additionally, as discussed in the government's Brief Regarding Restitution, filed in *Rhodes*, see Case No. 22-cr-15, ECF No. 654 at 4 n. 3, the Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is a victim under the analysis set forth above. MPD submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million).

Capitol building and grounds of those—such as Breheny—whose conduct caused the evacuation of hundreds of lawmakers and the suspension of the certification proceedings. The repair and clean-up costs were similarly extensive, and certainly "substantial." Therefore, the three-level enhancement under Section 2J1.2(b)(2) applies.

With respect to the eight-level upward adjustment for conduct that "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," under U.S.S.G. § 2J1.2(b)(1)(B), the parties and the PSR correctly found that this adjustment does not apply to Breheny. Unlike most of the other Oath Keeper members and affiliates convicted and sentenced in the *Rhodes* and *Parker* cases, Breheny is not being sentenced for any conspiracy charges, nor does the evidence show that he participated in the conspiracies proved in those cases. Thus, there is not the same level of relevant conduct for this Court to consider in sentencing Breheny as there was in the *Rhodes* and *Parker* sentencings, and there is not sufficient evidence for this Court to find that Breheny's conduct "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."

The PSR and parties did correctly determine that this Court should apply Section 3C1.1's two-level enhancement for obstruction of justice. This enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. The commentary to the Guidelines includes a non-exhaustive list of some of the ways that a defendant can obstruct justice,

including by deleting evidence or instructing others to do so, or attempting to do so. U.S.S.G. § 3C1.1, cmt. n. 4(D). Here, Breheny admitted through his guilty plea that he deleted photos of his presence in the Capitol on his phone and deleted his Facebook account, which contained information detailing his presence in the riot. ECF 58 at ¶26.

With respect to applicable downward adjustments to Breheny's Sentencing Guidelines range, a 2-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1, because the defendant has clearly demonstrated his acceptance of responsibility, and an additional 1-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1(b), because the defendant has assisted authorities by providing timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

The Court should not apply U.S.S.G. § 4C1.1, the so-called "zero-point-offender downward adjustment" to this case. Recent amendments to the Sentencing Guidelines for 2023 added § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Under Section 4C1.1(a)(3), however, the adjustment should not be applied to defendants who use violence or credible threats of violence in connection with their offense. "In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is

not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction." *United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

Here, Breheny's presence and conduct in part caused the continued interruption to Congressional proceedings; thus, the court should find that the defendant in fact impeded or disrupted the orderly conduct of Government business or official functions. While Breheny did not personally engage in violence, he joined the mob outside the East Rotunda Doors that forced entry into the Capitol, and thus participated in violence that should disqualify him from this adjustment. Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.[3]

To avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

In sum, based on this Sentencing Guidelines analysis, the defendant is at level 16 prior to

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

any downward departure for the substantial assistance he has provided to law enforcement.

**B.      Downward Departure for Substantial Assistance**

The government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure for the substantial assistance Breheny has provided to law enforcement. The government submits that a six-level downward departure is appropriate given the level and nature of assistance Breheny has provided.

The Guidelines provide that, "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. In determining the appropriate level of reduction to apply, the Court should consider the following factors:

> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;
>
> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>
> (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

Here, the second and fifth factors clearly apply and can be quickly addressed. Breheny was cooperative and truthful when he was first approached by law enforcement less than a week after this offense. On January 14, 2021, law enforcement agents approached Breheny and he agreed to

be interviewed by them. During that interview, he admitted to entering the Capitol. Several months later, when Breheny was charged and arrested, he reached out through counsel almost immediately to offer to cooperate, and he began proffering with law enforcement shortly thereafter. Breheny also expressed his willingness to plead guilty almost immediately, and he agreed to numerous continuances of his initial appearance and ultimately waived his right to be indicted and pled guilty to the instant felony offense pursuant to the filing of a criminal Information. Thus, Breheny's cooperation has been extremely timely. U.S.S.G. § 5K1.1(a)(5).

Breheny's cooperation has also been truthful, complete, and reliable. Much of the information he provided has been corroborated by other witnesses and objective evidence such as messages, video, photographs, and other data recovered from his phone and the devices and accounts of others recovered by law enforcement during this investigation. In other words, the second factor listed above also supports a finding of substantial assistance by Breheny. U.S.S.G. § 5K1.1(a)(5).

This cooperation was not without risks. To plead guilty pursuant to a public cooperation plea agreement in a case that has garnered such national interest and, sadly, controversy, took courage on Breheny's part. While the government is not aware of any direct threats to Breheny or his family, other individuals who cooperated publicly with the government in this investigation have received such threats. Thus, this court should give Breheny credit for the danger and risk of injury to himself and to his family that resulted from his entry into a public cooperation plea agreement in this case. U.S.S.G. § 5K1.1(a)(4).

With respect to the significance and usefulness of the defendant's assistance (the first and third factors), the defendant provided information about the leader and other members and

affiliates of the Oath Keepers who conspired to participate in the attack on the Capitol and interfere with the lawful transfer of power on January 6. By their nature, criminal conspiracies are challenging to prove without information from individuals on the inside—individuals like Breheny who may not have gone so far as to join the conspiracy but were privy to communications in furtherance of that conspiracy and could give color and context to their meaning.

Breheny provided such helpful information that supplemented the government's investigation into this conspiracy.

Finally, the nature and extent of Breheny's assistance has been significant. U.S.S.G. § 5K1.1(a)(3). He proffered multiple times with government, and the information he provided was truthful and material, although he ultimately did not testify at any trials or grand jury proceedings.

Taking all of these factors into account, a six-level downward departure would reduce Breheny's adjusted offense level by about 37.5 percent from the level 16 final adjusted offense level he would have faced absent his cooperation in this matter. The government submits that such a reduction appropriately reflects the principles outlined above that this Court should consider in assessing the level of assistance Breheny provided to law enforcement.

### C.    Sentencing Guidelines Recommendation

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 6. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at level 10, the defendant's Guidelines range is 6 to 12 months' imprisonment. Under U.S.S.G. § 5C1.1(c)(3), because level 10 is in Zone B of the Guidelines, the Court may satisfy the minimum term of imprisonment in this range by imposing "a sentence of probation that includes a condition or combination of conditions that substitute . . . home detention for imprisonment according to the schedule in subsection (e)," which suggests "one level of home detention for one day of imprisonment," U.S.S.G. § 5C1.1(e)(3). In other words, a sentence of probation with a period of six months of home detention would be a Guidelines-compliant sentence at level 10.

### VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the government's recommended sentence.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Breheny's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. He came to D.C. understanding the potential for a forcible interruption of the certification, he joined the violent rob that forced open the East Rotunda doors, and he personally breached the building and contributed to the delay of the proceedings. The nature and circumstances of Breheny's offense were of the utmost seriousness, and fully support the government's recommended sentence of six months of home confinement as part of his probation.

### B.  The History and Characteristics of the Defendant

At the time of this offense, Breheny was gainfully employed. He had no criminal history. He is an Air Force veteran. In other words, the defendant's crimes on January 6 were an isolated incident in an otherwise law-abiding life, although that fact also suggests Breheny should have known better and makes his conduct on January 6 hard to comprehend.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a period of home detention as part of the defendant's sentence. Breheny's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

A period of home detention, as opposed to straight probation, is appropriate in this case "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the

Capitol certainly was.[4] At the same time, early and public acceptance of responsibility, coupled with cooperation with law enforcement, is something that should be rewarded, to encourage others to take similar responsibility for their conduct on January 6. For these reasons, a probationary sentence with a period of home detention achieves the goal of general deterrence.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. The government is recommending a Guidelines-compliant sentence, should the Court apply the government's recommended departure for substantial assistance to law enforcement.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). The government's recommended sentence does not create unwarranted disparities when one considers that Breheny's conduct during this offense places him on the less culpable end of defendants who have pled guilty to obstructing Congress on January 6, coupled with the fact that he accepted responsibility at the earliest possible time and provided substantial assistance to law enforcement.[5]

## VII.  RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. Defendant Breheny did not personally cause any injuries to any officers or any damage to any property. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Breheny must pay $2,000 in restitution, which reflects in part the role he played in the riot on January 6.[7] ECF 57 at 9. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 2, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Breheny's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 8, n.4.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of three years of probation, with the special conditions that the defendant serve the first six months of probation on home confinement, perform 120 hours of community service, and pay

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

$2,000 in restitution and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:  
Kathryn L. Rakoczy
D.C. Bar No. 994-559
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W., Room 5.236
(202) 252-6928
Kathryn.Rakoczy@usdoj.gov